UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALI BAZZI,

       Plaintiff,

                                    Case No. 23-cv-10097

v.                                     Honorable Linda V. Parker

FCA US LLC,

       Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This lawsuit arises from Plaintiff Ali Bazzi's employment with Defendant FCA US LLC ("FCA"). In a three-count Complaint filed on January 12, 2023, Mr. Bazzi alleges national origin discrimination by FCA in violation of: (I) 42 U.S.C. § 1981; [1] (II) Title VII of the Civil Rights Act of 1964 ("Title VII"); and (III) Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"). The matter is presently before the Court on FCA's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, which has been fully briefed. (ECF Nos. 13, 15, 16.) Mr. Bazzi also filed a notice of supplemental authority (ECF No. 17), to which FCA responded (ECF No. 19). Finding the facts and legal arguments adequately

---

[1] For this claim, Mr. Bazzi also lists "ethnicity" as a basis for discrimination.

presented in the parties' briefs, the Court dispenses with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.    Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248). The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255.

## II.    Factual Background

Mr. Bazzi, who was born in Kuwait and immigrated to the United States as a teenager, began working at FCA in 1993. (ECF No. 13-4 at PageID. 131, 138.) As

2

an FCA employee, Mr. Bazzi was represented by the International Union, United

Automobile Aerospace and Agriculture Implement Workers of America (hereafter

"union").  Throughout his employment, Mr. Bazzi has worked at FCA's Warren

Truck Assembly Plant ("WTAP").  (*Id.* at PageID. 138.)

Since 2014, Mr. Bazzi has endured regular harassment by co-workers based

on his Middle Eastern origin, which he has reported to FCA.  (*See generally* ECF

No. 1; ECF No. 13 at PageID. 81-85.)  While Mr. Bazzi describes some of this

harassment in his Complaint, he indicates that his present claims arise only from an

incident on September 15, 2020, and his resulting discipline.  (*See* ECF No. 13-4 at

PageID. 151; ECF No. 15 at PageID. 459, 471.)

On September 15, Mr. Bazzi found his work area blocked by a cart of

precariously stacked tools.  (ECF No. 13-23 at PageID. 336.)  When Mr. Bazzi

moved the cart to access his work area, some of the items fell.  (*Id.*)  After

returning the items to the cart, Mr. Bazzi sat down at his work area.  (*Id.*)

According to Mr. Bazzi, a co-worker, Jason Falleti (a/k/a "Rocco"), then

began making comments to Mr. Bazzi, stating that Mr. Bazzi destroys things and

causes problems in the department.  (*Id.*)  After Mr. Falleti approached Mr. Bazzi's

work bench and began "saying other stuff," the two men began to argue and curse

at one another.  (*Id.*; *see also* ECF No. 13-4 at PageID. 142.)  Other co-workers

joined in the argument on Mr. Falleti's side and started calling Mr. Bazzi a "liar"

and the "F word."  (ECF No. 13-25 at PageID. 342.)  In response, Mr. Bazzi called his co-workers "white supremacists."[2]  (ECF No. 13-4 at PageID. 141; *see also* ECF No. 13-18 at PageID. 321.)  Mr. Bazzi has explained that he was "crying out" for "help" to his manager, who was standing nearby, and to let the manager know that he was "tired of this racial discrimination."  (ECF No. 13-4 at PageID. 141; *see also* ECF No. 15-8 at PageID. 583.)

The next day, FCA suspended Mr. Bazzi pending an investigation.  (ECF No. 15-6 at PageID. 557.)  After an investigation, FCA concluded that Mr. Bazzi had violated company policy by calling Mr. Falleti a white supremacist, specifically Policy 3-6, titled "Discrimination and Harassment Prevention."  (*See* ECF No. 13-21 at PageID. 332.)  Policy 3-6 prohibits harassment and discrimination in the work environment.  (*See* ECF No. 13-3.)  FCA's Labor Representative, Sharta Burston, who investigated the incident, determined that Mr. Bazzi's use of the term "white supremacist" was "derogatory" because it "identified race."  (ECF No. 15-8 at PageID. 583, 586.)  On October 16, 2020, FCA terminated Mr. Bazzi, effective immediately, as a result of this conduct.  (ECF No. 13-24.)

---

[2] Mr. Falleti and other witnesses to the incident reported that Mr. Bazzi directed his comment to Mr. Falleti and yelled, "You're a white supremacist."  (*See* ECF No. 13-21 at PageID. 331-32.)  The Court takes Mr. Bazzi's version as true for purposes of FCA's motion.  *See Liberty Lobby*, 477 U.S. at 255.

The union filed a grievance, claiming that Mr. Bazzi was unjustly discharged in violation of the collective bargaining agreements between the union and FCA. (ECF No. 13-22 ag PageID. 334.)  FCA initially denied the grievance.  (*Id.*)  A negotiated resolution of the grievance ("Disposition") subsequently was reached before the FCA and union Appeal Board on March 22, 2021, resulting in the conversion of Mr. Bazzi's termination to a suspension without pay.  (ECF No. 13-28.)  The Appeal Board is comprised of two union representatives and two FCA representatives.  (ECF No. 15-11 at PageID. 645 § 28(a).)

The Disposition reads:

> In full and complete settlement of this case, the grievant will be reinstated in accordance with his seniority provided he can meet normal reinstatement requirements, including a physical.

> Upon reinstatement the grievant's termination will be converted to a suspension.  The company agrees to submit for eligible 2020 profit sharing paid in 2021.  The grievant will not receive any back pay of wages, health care, or any other benefits for the period during which he was away from the facility.

> All contractual grievances, charges, claims, and/or complaints that were filed or that could have been filed that concern this termination of employment are resolved.

> This agreement of the Appeal Board shall form no basis or precedent for a decision or settlement in any other case.

(ECF No. 13-28.)  The Appeal Board's four members signed the Disposition.  (*Id.*)  Mr. Bazzi did not, and he did not see it before he returned to work.  (*Id.*; ECF No. 13-4 at PageID. 148.)

5

After being informed of the Disposition, Mr. Bazzi asked his union representative about his right to back pay.  (ECF No. 13-4 at PageID. 148.)  The union representative told Mr. Bazzi that her job was limited to getting him back to work under the contractual grievance.  (*Id.*)  Mr. Bazzi explained during his deposition in this case that the union "only deal[s] with contractual violation[s] and grievances."  (*Id.*)  The union representative also told Mr. Bazzi that he could pursue back pay "on the outside," which he understood to mean through the Equal Employment Opportunity Commission ("EEOC") or a lawsuit.  (*Id.*)

Mr. Bazzi had filed an EEOC Charge of Discrimination on October 2, 2020, after he was suspended without pay.  (*See* ECF No. 13-25.)  In the section of the charge reflecting the "cause of discrimination based on," Mr. Bazzi checked the "retaliation" and "national origin" boxes.  (*Id.*)  In the narrative section, he described discrimination beginning in 2014, when FCA placed workers from another plant in his department, through the incident on September 15, 2020.  (*Id.*)

In an "amended" charge filed on January 18, 2021, Mr. Bazzi checked only the "retaliation" box, and he described additional discriminatory conduct he experienced at FCA.  (ECF No. 1 at PageID. 18.)  After receiving a Notice of Right to Sue from the EEOC, Mr. Bazzi filed the current lawsuit.

Mr. Bazzi has continued to work at FCA since he returned to his job on April 26, 2021.  In addition to the wages he did not receive during his almost seven-

month suspension, Mr. Bazzi claims he lost benefits, pension earnings, a bonus, seniority, the ability to apply for promotion, and his established shift and location. (ECF No. 1 at PageID. 6-7 ¶ 25.)

## III.   FCA's Arguments & Mr. Bazzi's Response

FCA maintains that Mr. Bazzi's § 1981 claim fails as a matter of law because the statute only prohibits race discrimination.  Mr. Bazzi fails to address this argument in response to FCA's motion.  Therefore, the Court deems the claim waived.  *See United States v. Crozier*, 259 F.3d 503, 517 (6th Cir. 2001) (quoting *United States v. Layne*, 192 F.3d 556, 566 (6th Cir. 1999)) (explaining that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); *Slater v. Potter*, 28 F. App'x 512, 513 (6th Cir. 2002) (citing *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

FCA also argues that many of the incidents described in Mr. Bazzi's Complaint are time-barred either under the six-month limitations period in his employment contract or by statute.  As FCA acknowledges, however, this argument does not apply to Mr. Bazzi's claims arising from his discipline in September and October 2020.  This discipline is the only action on which his current claims are based.

As to those claims, FCA asserts that they are barred by the "grievance settlement" which allowed Mr. Bazzi to be reinstated.  Mr. Bazzi disagrees, arguing

that the Appeal Board Disposition only resolved the union's contractual grievance and not any non-contractual claims.  Mr. Bazzi maintains that he did not waive his Title VII or any other statutory claims as a result of the Disposition.

FCA argues, as well, that Mr. Bazzi cannot demonstrate the elements required to prove his Title VII and ELCRA discrimination claims.  The Court elaborates on FCA's arguments and Mr. Bazzi's response below.

## IV.    Applicable Law & Analysis

### A.    Whether the Disposition Bars Mr. Bazzi's Title VII & ELCRA Claims

The Sixth Circuit has found "that under particular circumstances employers and employees may negotiate a valid release of . . . Title VII claims."  *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 617-18 (6th Cir. 2024) (quoting *Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995)).  When deciding whether employees validly waived their rights, courts apply "federal common law" and "ordinary contract principles."  *Id.* at 618 (brackets and citations omitted).  The court must "remain[] alert to ensure that employers do not defeat the policies of . . . Title VII by taking advantage of their superior bargaining position or by overreaching."  *Adams*, 67 F.3d at 583.  Several factors are relevant to deciding whether a release was knowingly and voluntarily executed: "(1) the plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an

8

opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances." *Moore*, 113 F.4th at 618 (quoting *Adams*, 67 F.3d at 583) (brackets omitted).

Mr. Bazzi argues in his response brief that, according to the plain language of the Disposition, only his contractual disputes against the FCA were waived. The Disposition in fact reads: "All *contractual* grievances, charges, claims, and/or complaints . . . are resolved." (ECF No. 15-10 at PageID. 605 (emphasis added).) While there is no general grammatical rule that an adjective at the start of a list qualifies all items in the list, the language of the Disposition suggests that that was intended here.

First, the only grievances the Appeal Board has the power to decide are those that are contractual. (*See* ECF No. 15-11 at PageID. 646 § 29.) Thus, "all contractual" is superfluous unless it also defines "charges, claims, and complaints." Similarly, because the Appeal Board lacks authority over disputes asserting an employee's statutory rights, it is restricted to deciding *contractual* "charges, claims, or complaints."

This interpretation is bolstered by the last paragraph of the Disposition providing that it "form[s] no basis or precedent for a decision or settlement *in any other case*." (ECF No. 15-10 (emphasis added).) The fact that Mr. Bazzi did not sign and was not required to sign the Disposition also reflects that it resolved only

a dispute between the union and FCA, and not any independent claims, charges, or complaints that Mr. Bazzi had regarding his termination.  Mr. Bazzi was expressly advised that he retained the right to pursue his individual statutory rights.

FCA does not attempt to interpret the Disposition in its initial brief supporting its summary judgment motion.  (*See* ECF No. 13 at PageID. 89-91.) Instead, FCA begins its waiver argument from the assumption that the Disposition applies to Mr. Bazzi's pending statutory claims.  (*Id.*)  While Mr. Bazzi argues in response that the plain language of the Disposition did not waive his rights to pursue his statutory claims elsewhere, FCA neglects to address that argument in reply.  (*See* ECF No. 16.)  Therefore, the issue is waived.  *See, e.g., Crozier*, 259 F.3d at 517 (quoting *Layne*, 192 F.3d at 566).

For the reasons discussed, the Court finds that the Disposition does not bar Mr. Bazzi from pursuing his statutory rights.  It, therefore, is unnecessary to decide whether any waiver was knowing and voluntary under the relevant factors.

### B.   Whether Mr. Bazzi Can Demonstrate the Elements of His Title VII and ELCRA Claims

As Mr. Bazzi makes clear in his response brief, the only claims he is alleging here are retaliation in violation of Title VII and the ELCRA.  FCA argues in reply that, throughout these proceedings, Mr. Bazzi has alleged discrimination and not retaliation, and it is too late for him to now recast his claims under a retaliation theory.  But retaliation is simply "another form of intentional discrimination."  *See*

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005) (explaining that "[r]etaliation is, by definition, an intentional act.  It is a form of 'discrimination' because the complainant is being subjected to differential treatment"); *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 363 (2013) (Ginsburg, J., dissenting) (explaining that "Title VII also makes it an 'unlawful employment practice' to discriminate against any individual 'because' the individual has complained of, opposed, or participated in a proceeding about prohibited discrimination" and "*[t]his form of discrimination* is commonly called 'retaliation,' although Title VII does not use that term") (quoting 42 U.S.C. § 2000e-3(a)) (emphasis added).

In any event, Mr. Bazzi clearly alleges in his Complaint that FCA terminated him for "opposing discrimination."  (*See* ECF No. 1 at PageID. 10 ¶¶ 45, 51 ("Defendant illegally terminated Plaintiff for asserting his rights under [Title VII/ELCRA], opposing discrimination, complaining about discrimination and contesting unlawful employment practices under [Title VII/ELCRA].")  Further, he checked the box for "retaliation" on his EEOC charges (ECF No. 1 at PageID. 18; ECF No. 13-25), described being suspended and terminated for "protesting the ongoing discrimination" in the parties' "Rule 26 Joint Case Management Report/Proposed Discovery Plan" (ECF No. 7 at PageID. 44), and testified at his deposition that he believes he "was illegally terminated because [he] was

complaining about . . . getting harassed and discriminated against" (ECF No. 13-4 at PageID. 130).

FCA had "fair notice" of Mr. Bazzi's retaliation claims.[3]

### 1. Legal Standards for Proving Retaliation

Title VII and the ELCRA prohibit discrimination against employees because they have engaged in conduct protected by those statutes. *See* 42 U.S.C. § 2000e–3(a); Mich. Comp. Laws § 37.2701(a). The Sixth Circuit has provided that the legal standard for a retaliation claim under these statutes is identical. *See Jackson v. Genesee Cnty. Road Comm'n*, 999 F.3d 333, 344 n.1 (6th Cir. 2021) (citing *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012)).

"[A] Title VII [or ELCRA] retaliation claim can be established 'either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation.'" *Laster . City of Kalamazoo*, 746

---

[3] Mr. Bazzi argues that because FCA did not move for summary judgment on his retaliation claims in its opening brief, those claims "must be set for trial before a jury." (ECF No. 15 at PageID. 477.) Although, as discussed, FCA had notice of those claims before it moved for summary judgment, FCA did wait until its reply brief to assert its arguments for why it is entitled to summary judgment with respect to those claims. Generally, arguments raised "for the first time in a reply brief are waived." *Bormuth v. Cnty. of Jackson*, 870 F.3d 494, 500 (6th Cir. 2017) (quoting *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010)). Nevertheless, FCA always could move to file a second summary judgment motion or move at trial for a directed verdict if there is no factual or legal support for the claims. Thus, for expediency and the preservation of judicial and legal resources, the Court will proceed to analyze FCA's arguments with respect to Mr. Bazzi's retaliation claims notwithstanding the procedural defect.

F.3d 714, 730 (6th Cir. 2014) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)).  "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful retaliation was a motivating factor in the employer's action."  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *Laderach v. U-Haul of N.W. Ohio*, 207 F.3d 825, 829 (6th Cir. 2000)).  "Direct evidence proves the existence of a fact without any inferences or presumptions."  *Id.* (quotation marks, citation, and brackets omitted).

When a plaintiff presents direct evidence of a retaliatory intent, "the burdens of production and persuasion shift to the employer to prove" that it would have taken the adverse action against the plaintiff even if it had not been motivated by an impermissible motivation.  *See Taylor v. Bd. of Educ. of Memphis City Schs.*, 240 F. App'x 717, 720 (6th Cir. 2007) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)); *see also Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 432 (6th Cir. 2014) (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002)) (explaining that if the plaintiff presents direct evidence of retaliation, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.").  Absent direct evidence, the burden-shifting framework outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-04 (1973), applies.

Under this framework, the plaintiff first carries the burden of establishing a prima facie case of retaliation. *Id.* at 802. The plaintiff must show: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Laster*, 746 F.3d at 730 (quotation marks and citation omitted). "Title VII retaliation claims 'must be proved according to traditional principles of but-for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Id*. at 730-31 (quoting *Nassar*, 570 U.S. at 362).

If the plaintiff demonstrates a prima facie case of retaliation, "the burden of production shifts to the employer to articulate some legitimate, non-[retaliatory] reason for its actions." *Laster*, 746 F.3d at 730. If the employer makes such a showing, the burden returns to the plaintiff to show that the "proffered reason was not the true reason for the employment decision." *Id*. (citing *Dixon v. Gonzalez*, 481 F.3d 324, 333 (6th Cir. 2007)). "Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process." *Id.* (citing *Dixon*, 481 F.3d at 333).

14

### 2.    The Parties' Arguments

Mr. Bazzi maintains that "[t]his is the rare case where direct evidence" exists to demonstrate retaliation.  He argues that he "engaged in protected activity when he opposed racism by identifying the racism as it was happening to him . . . he called out 'white supremacist' in front of management personnel as a 'cry for help' to get assistance when he felt attacked by [Mr.] Falleti as he had been attacked by other employees in the past due to his national origin."  (ECF No. 15 at PageID. 475.)  During FCA's investigation of the incident, Mr. Bazzi explained that this was what he had been doing when he used the term "white supremacist."  (ECF No. 15-5 at PageID. 554.)  Thus, Mr. Bazzi argues, FCA was aware that he was identifying and opposing discrimination based on his national origin.  (*Id.* at PageID. 476.)  FCA admittedly then terminated Mr. Bazzi for this conduct.  (*Id.* (citing ECF No. 15-8 at PageID. 582).)

For the same reasons, Mr. Bazzi argues that he can demonstrate a prima facie case of retaliation: (1) he engaged in protected activity; (2) FCA was aware that he did so; (3) FCA suspended and then terminated him for engaging in that protected activity; and (4) FCA admits that the cause of the adverse action was that activity.

FCA argues in reply that this is not a direct evidence case because "evidence of discrimination is not considered direct evidence unless a racial motivation is

explicitly expressed." (ECF No. 16 at PageID. 825 n.3 (quoting *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006)).) FCA further argues that, to be direct evidence, "the evidence in question must 'lead ineluctably to the conclusion' that the unlawful consideration played a role in the decision at issue." (*Id.* (quoting *Amini*, 440 F.3d at 359).) FCA asserts that it disciplined Mr. Bazzi because he violated Policy 3-6, not due to an improper motivation.

As to Mr. Bazzi's ability to demonstrate a prima facie case of retaliation, FCA argues that he cannot satisfy two of the required elements: that he engaged in protected conduct and that the protected conduct was a significant factor in FCA's decisions. Specifically, FCA argues that Mr. Bazzi did not engage in protected conduct by calling Mr. Falleti a white supremacist and this "derogatory comment . . . violated [FCA]'s Policy 3-6 and therefore caused [Mr. Bazzi] to lose protection under the law." Further, FCA argues that it disciplined Mr. Bazzi "because [he] violated the discrimination and harassment policy by making a racially derogatory comment to his coworker, not because of a purported complaint about discrimination." FCA asserts that Mr. Bazzi cannot demonstrate that this legitimate reason for his discipline was a pretext for retaliation.

### 3.    Analysis

#### 1.    *Whether Mr. Bazzi Engaged in Protected Conduct*

The Court begins with the question of whether Mr. Bazzi engaged in protected activity when he used the term "white supremacist."

Under Title VII's opposition clause, it is unlawful for "an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . .." 42 U.S.C. § 2000e-3(a).  Similarly, the ELCRA states that one shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act."  Mich. Comp. Laws § 37.2701(a).  Neither statute defines "opposed" as used in their opposition clauses.  *See* 42 U.S.C. §§ 2000e, 2000e-3; Mich. Comp. Laws §§ 37.2202, .2701.  Caselaw and EEOC guidance provide clarification, however.

The Supreme Court has explained that " 'opposed' . . . carries its ordinary meaning: to resist or antagonize . . .; to contend against; to confront; resist; withstand."  *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (quoting Webster's New Int'l Dictionary 1710 (2d ed. 1957)).  Relying on the EEOC's interpretation of the opposition clause, the Supreme Court has further explained that "[w]hen an employee communicates to [his or] her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's

17

opposition to the activity." *Id*. at 276 (cleaned up); *see also EEOC v. New Breed Logistics*, 783 F.3d 1057, 1067 (6th Cir. 2015) (instructing that "great deference" must be afforded to the EEOC's interpretation of what constitutes opposing conduct). The Sixth Circuit has expressed that the definition of the term is "expansive[.]" *New Breed Logistics*, 783 F.3d at 1067.

The Sixth Circuit has added that "[t]o come within the protection of Title VII," the plaintiff must show that he or she "challenged an employment practice that [the plaintiff] reasonably believed was unlawful," even if that belief is incorrect. *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645-46 (6th Cir. 2015). The complaint may be directed "to anyone (management, unions, other employees, or newspapers)," and it need not "be lodged with absolute formality, clarity, or precision." *Jackson*, 999 F.3d at 344-45 (citations omitted). However, "the plaintiff must allege more than a 'vague charge of discrimination.'" *Id.* at 345 (quoting *Yazdian*, 793 F.3d at 645). "The governing principle from [Sixth Circuit] caselaw is not that magic words must be intoned but that the language used be enough, in a specific factual context, to convey the accusation and its basis." *Crawford v. Chipolte Mexican Grill, Inc.*, 773 F. App'x 822, 829 (6th Cir. 2019) (finding that an employee's accusation that a manager was "discriminating against" and "harassing" a black employee was "just enough to get past summary judgment").

Nevertheless, to be protected, the plaintiff's opposition must be expressed "in a reasonable manner." *Jackson*, 999 F.3d at 345 (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)). This means, "[f]or example," that "an employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals." *Id.* (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)). As the Sixth Circuit provided in *Booker*, "there may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered." 879 F.2d at 1312 (internal quotation marks and citation omitted).

Determining whether an employee's opposition was conducted in a "reasonable manner" involves "a balancing test to balance 'the employer's recognized, legitimate need to maintain an orderly workplace . . . , and the equally compelling need of employees to be properly safeguarded against retaliatory actions.'" *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 331 (6th Cir. 2010) (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 722 (6th Cir. 2008)). "The ultimate question under the balancing test is whether the employee's actions were reasonable under the circumstances." *Id.* (quoting *Niswander*, 529 F.3d at

19

725). This a "a fact-intensive inquiry[.]" *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471 (6th Cir. 2012). Nevertheless, circuit courts have warned that the reasonableness requirement must be read "narrowly lest legitimate activism by employees asserting civil rights be chilled." *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1570 (1989) (quoting *Wrighten v. Metro. Hosp., Inc.*, 726 F.2d 1346, 1355 (9th Cir. 1984)).

Viewing the facts in a light most favorable to Mr. Bazzi, a reasonable juror could construe Mr. Bazzi's statement, in the context in which it was made, as protected opposition to unlawful harassment. On its own, Mr. Bazzi's use of the term "white supremacists" to describe his coworkers or telling Mr. Falleti that "you're a white supremacist" may not seem like opposition to unlawful behavior. *See, e.g., Booker*, 879 F.2d at 1313 (holding that an allegation that the plaintiff's supervisor may be a racist does not constitute protected activity as "the allegation is not that [the employer] is engaging in unlawful employment practice, but that one of its employees has a racial intolerance); *Cooks v. Ford Motor Co.*, No. 3:21 CV 1368, 2023 WL 3740302, at *9 (N.D. Ohio May 31, 2023) (characterizing as "at most a vague charge of discrimination" the plaintiff's calling another employee racist "for believing all black people look the same" after that employee docked the plaintiff's pay for leaving his shift early when the plaintiff denied leaving early); *Childers v. Gen. Motors LLC*, No. 16-cv-14428, 2019 WL 630274, at *7 (E.D.

Mich. Feb. 14, 2019) (finding that registering an "isolated complaint" about a single "racist remark" was not protected activity).  However, since 2014, Mr. Bazzi had been complaining to FCA management about his co-workers' harassment based on his national origin.  On September 15, 2020, surrounded by coworkers who had harassed and picked on him in the past, including Mr. Falleti, and with his manager nearby doing nothing, Mr. Bazzi called the group "white supremacists" as a "call for help."

> The EEOC Guidance on Retaliation provides:
>
> [E]ven reporting an isolated single incident of harassment is protected opposition if the employee "reasonably believes that a hostile work environment is in progress, with no requirement for additional evidence that a plan is in motion to create such an environment or that such an environment is likely to occur."  Likewise, it is protected opposition if the employee complains about offensive conduct that, if repeated often enough, would result in an actionable hostile work environment.

See 2016 WL 4688886, at *10 (Aug. 25, 2016) (footnotes omitted); see also id. (observing that "the hostile work environment liability standard is predicated on encouraging employees to report harassing conduct *before it becomes severe or pervasive*").  As stated earlier, "the EEOC's interpretation of 'opposing' conduct" must be "given 'great deference[.]"  *New Breed Logistics*, 783 F.3d at 1067 (quoting *Johnson*, 215 F.3d at 580 n.8) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 434 (1971)).

The Court also believes that a reasonable jury could conclude that Mr.

Bazzi's opposition to what he perceived to be a hostile work environment was not

made in an unreasonable manner. Mr. Bazzi did not engage in or threaten physical

violence. The record does not reflect that he has engaged in repetitive outbursts,

nor does it show that his conduct interfered with FCA's business operations. This

was a solitary event and, viewed in a light most favorable to Mr. Bazzi, was

triggered by ongoing national origin discrimination by his co-workers.

As the Tenth Circuit has observed: "An emotional response to a racial or

religious epithet is a most natural human reaction. It would be ironic, if not

absurd, to hold that one loses the protection of an antidiscrimination statute if one

gets visibly (or audibly) upset about discriminatory conduct." *Hertz v. Luzenac*

*Am., Inc.*, 370 F.3d 1014, 1022 (10th Cir. 2004). Other courts have made similar

observations. *See NLRB v. Mueller Brass Co.*, 501 F.2d 680, 686 (5th Cir. 1974)

(addressing the employee's "abusive confrontation with [his] supervisor," and

finding that the employee's "indignation . . . was understandable. Expression of

his anger in the language of the mill is not nearly as shocking to us as [the

employer]'s counsel would suggest . . . [the employee]'s outburst was spontaneous

and was provoked by unlawful conduct of his employer"); *NLRB v. M & B*

*Headwear Co.*, 349 F.2d 170, 174 (4th Cir. 1965) (stating with regard to the

employee's threat to harm a supervisor and telling him to shut up that "[a]n

employer cannot provoke an employee to the point where she commits such indiscretion . . . and then rely on this to terminate her employment" and that "[t]he more extreme an employer's wrongful provocation the greater would be the employee's justified sense of indignation and the more likely its excessive expression"); *Starling v. Gen. Motors, LLC*, No. 3:21-cv-750, 2024 WL 4028711, at *5 (S.D. Miss. Sept. 3, 2024) (expressing that "[i]t cannot be true that an employer can discriminate against or sexually harass an employee and nevertheless be immunized from liability if the employee raises their voice when he or she complains about it").

"Of course there are limits.  Actions accompanying an emotional outburst cannot be unchecked."  *Hertz*, 370 F.3d at 1022.  However, in cases where the employee's conduct was found not cloaked with statutory protection, the employee had been disruptive over a period of time and/or the disruptions were serious, for example because they interfered with the employee's or another worker's job performance or disrupted business operations.  *See, e.g., McDonnell Douglas Corp.*, 411 U.S. at 794, 803 (finding that unlawfully stalling cars on the main roads leading to the petitioner's plant for the purpose of blocking access to it at the time of the morning shift change and placing a chain and padlock on the front door of a building to prevent employees from leaving were not protected opposition); *Robbins v. Jefferson Cnty. Sch. Dist. R-1*, 186 F.3d 1253, 1259 (10th Cir. 1999)

23

(finding the employee's response "not reasonable" where she "lodged frequent, voluminous, and sometimes specious complaints and engaged in antagonistic behavior towards her superiors"); *Jennings v. Tinley Park Cmty. Consol. Sch. Dist. No. 146*, 864 F.2d 1368, 1374-75 (7th Cir. 1988) (concluding that the plaintiff's conduct "exceeded the cloak of statutory protection" where she engaged in deliberate conduct "to sandbag" her supervisor and hinder his ability to do his job); *Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 230-34 (1st Cir. 1976) (finding the plaintiff's conduct "so extreme as to fall outside the ambit of Title VII" where she disrupted staff meetings, "interfered with ongoing research and upset the other scientists," circulated negative rumors concerning the Foundation, invited someone "to conduct a covert affirmative action survey at the Foundation," invited a reporter "to examine her files containing confidential salary information for employees at the Foundation," was reprimanded several times for unsatisfactory work, ran up the Foundation's telephone bill for personal calls concerning her complaints and misused secretarial assistance and xeroxing services, caused employees to leave, and created a number of other disturbances, which persisted over a three-year period). And, again, the exceptions to protection "must be read narrowly lest legitimate activism by employees asserting civil rights be chilled." *Grant*, 880 F.2d at 1570 (quoting *Wrighten*, 726 F.2d at 1355).

2.      *Whether Mr. Bazzi Presents Direct Evidence of
        Retaliation*

In the context of a retaliation claim, direct evidence exists where the

plaintiff's protected statements are specifically identified as a reason for the

disciplinary action against the plaintiff.  *See, e.g. Yazdian*, 793 F.3d at 648 (finding

direct evidence when a supervisor specifically referenced the plaintiff's protected

statements as examples of the plaintiff's insubordination when terminating the

plaintiff); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)

(not finding direct evidence, but noting as an example of direct evidence of

retaliation "an explicit statement from [the defendant] that it was firing [the

plaintiff] in response to his discrimination claims"); *Lott v. Tradesmen Int'l, Inc.*,

No. 5:09-cv-183, 2012 WL 2374238, at *4 (E.D. Ky. June 22, 2012) (finding direct

evidence when the plaintiff complained about sex discrimination to her employer

and hired an attorney, and when she indicated in a conversation with her supervisor

that she believed the reason for her termination was her lawsuit, her supervisor

responded "pretty much").  Here, FCA undisputedly disciplined Mr. Bazzi for his

"white supremacists" comment—i.e., his protected conduct.[4]

---

[4] Even if required to demonstrate a prima facie case of retaliation, Mr. Bazzi does
so for the reasons he articulates.

25

> 3.  *Whether FCA Had a Legitimate Non-Retaliatory Reason*
> *for Terminating Mr. Bazzi and Whether that Reason was*
> *a Pretext for Retaliation*

FCA maintains that it had a legitimate, non-retaliatory reason for terminating

Mr. Bazzi:  He violated Policy 3-6.  (*See* ECF No. 16 at PageID. 827.)  Under

Sixth Circuit caselaw, a plaintiff can demonstrate pretext in three ways: "(1) that

the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not

actually motivate the employer's action, or (3) that [the reason was] insufficient to

motivate the employer's action."  *Romans v. Mich. Dep't of Human Servs.*, 668

F.3d 826, 839 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400

(6th Cir. 2009)).  The Court believes a reasonable jury could find FCA's reason to

be a pretext for unlawful retaliation.

Policy 3-6 prohibits workplace harassment and discrimination.  (*See* ECF

No. 13-3.)  The policy provides as examples of harassment:

> unwelcome physical conduct; threats or intimidation; displaying
> offensive items or pictures; interfering with or sabotaging someone's
> work or personal or assigned property; and making jokes or
> inappropriate comments about a person's race, color, sex, sexual
> orientation, gender identity, transgender status, age, protected veteran
> status, marital status, religion, national origin, disability status or
> genetic information.

(*Id.*)  The policy further provides that "[o]ne act or a series of acts may constitute

harassment."  (*Id.*)

FCA concluded that Mr. Bazzi violated Policy 3-6 by making racially offensive remarks.[5]  However, "[t]he term 'white supremacist' is not a racial classification.  It is used to identify someone as being associated with a racially motivated group."  *Davis v. City of Aransas Pass*, No. 2:13-cv-363, 2014 WL 2112701, at *1 (S.D. Tex. May 20, 2014), *aff'd* 605 F. App'x 429 (5th Cir. 2015); *see also McIlvaine v. 1SEO Tech., Inc.*, 485 F. Supp. 3d 582 , 585-86 & n. 12 (E.D. Pa. 2020) (citations omitted) ("Although Plaintiff argues that an accusation of being a white supremacist is necessarily an accusation based on race, this is not so").  FCA fails to cite authority to conclude otherwise.  Therefore, FCA's reason has no basis in fact.[6]

---

[5] FCA's records do not specifically identify Mr. Bazzi's comment as "racially offensive" and, therefore, violative of Policy 3-6.  (*See, e.g.*, ECF No 1 at PageID. 14; ECF No. 13-21.)  However, FCA maintains in its briefs that the disciplinary action was justified because the remarks fit this category and it has treated other employees who made "racially offensive remarks" similarly.  (*See, e.g.*, ECF No. 13 at PageID. 80, 87 (arguing that had a "legitimate concern about Bazzi violating its policy prohibiting racially offensive comments," and that Mr. Bazzi cannot establish that he was treated more harshly than similarly situated co-workers because FCA terminated seven other employees and suspended one other "for making racially offensive remarks).  Further, the individual who alone investigated the incident and decided what discipline to impose testified that she concluded Mr. Bazzi used a "derogatory" term because it "identified race."  (ECF No. 15-8 at PageID. 583, 586.)  Thus, the Court does not consider whether Mr. Bazzi's comment otherwise violated the policy.

[6] FCA maintains that it has terminated and suspended employees for similar violations, such as calling a co-worker the "N" word.  However, for the reason just discussed, the examples FCA offers are not comparable.  (*See* ECF No. 13-27 at PageID. 398-436.)

27

FCA contends that this Court must defer to its "business judgment" that Mr. Bazzi's use of the term "white supremacist" was racially derogatory.  (*See* ECF No. 13 at PageID. 103 n.6 (citing *Ladd v. Grand Trunk W. R.R.*, 552 F.3d 495, 503 (6th Cir. 2009); *Michael v. Caterpillar Fin. Serv. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007).)  "An employer's business judgment, however, is not an absolute defense to unlawful discrimination."  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (citing *EEOC v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir. 1997)) ("Although it is true that a factfinder should refrain from probing an employer's business judgment, a decision to terminate an employee based upon unlawful considerations does not become legitimate because it can be characterized as a business decision.").  As the Sixth Circuit provided, "the reasonableness of an employer's decision may be considered to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation."  *Id.* (citations omitted).

Moreover, as courts have discussed, an employer cannot fail to respond to an employee's complaints of unlawful harassment or conduct in the workplace and then discipline that employee for his or her response to the harassment or conduct. *See, e.g., Nichols*, 152 F. Supp. 3d at 1140-41; *Speed v. WES Health Sys.*, 93 F. Supp. 3d 351, 364 (E.D. Pa. 2015) ("Even if one were to conclude that [the plaintiff]'s conduct in striking her harasser was inappropriate under all of the

circumstances, it would be profoundly anomalous to protect the very employer which had failed in the first instance to protect her; but for that failure, [the p]laintiff need not have confronted an escalation of [her harasser]'s behavior").  As the *Nichols* court reasoned:  "'To allow an employer to ignore clear warning signs and then terminate an employee who resists [unlawful] harassment and assault at the workplace' or . . . who resists threats of violence based on his religion 'is to deny the employee the basic protection against discrimination which Title VII affords.'"  152 F. Supp. 3d at 1140-41 (quoting *Van Horn v. Specialized Support Servs., Inc.*, 241 F. Supp. 2d 994, 1014 (S.D. Iowa 2003)) (brackets omitted).  The Eighth Circuit has found that "[w]hen an employee is fired because he acted to defend himself against harassment, which supervisors failed to take reasonable measures to prevent or correct, the termination process cannot be said to be free from discrimination."  *Excel Corp. v. Bosley*, 165 F.3d 635, 639 (8th Cir. 1999) (citing *DeGrace v. Rumsfeld*, 614 F.2d 796, 804 (1st Cir. 1980); *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1060 (8th Cir. 1993)).

The same principle has been expressed in National Labor Relations Act cases:  "An employer cannot provoke an employee to the point where [the employee] commits . . . an indiscretion . . . and then rely on this to terminate [the employee's] employment."  *NLRB v. M & B Headwear Co.*, 349 F.2d 170, 174 (4th Cir. 1965); *see also Precision Window Mfg., Inc. v. NLRB*, 963 F.2d 1105, 1108

(8th Cir.1992) (stating that "[a]n employer may not provoke an employee and then rely on the employee's intemperate response as a ground for not reinstating him"); *Tr. of Boston Univ. v. NLRB*, 548 F.2d 391, 393 (1st Cir. 1977) (quoting *M & B Headwear*, 349 F.2d at 174); *NLRB v. Mueller Brass Co.*, 501 F.2d 680, 685-86 (5th Cir. 1974) (same). As the Fourth Circuit reasoned in *M & B Headwear* when rejecting the employer's argument that an employee was terminated for her verbal outbursts rather than her pro-union activities in violation of the NLRA:

> We in no way condone insubordination and in normal situations it would be a justifiable ground for dismissal. But we cannot disregard the fact that the unjust and discriminatory treatment of [the employee] gave rise to the antagonistic environment in which these remarks were made.
>
> An employer cannot provoke an employee to the point where she commits such an indiscretion as is shown here and then rely on this to terminate her employment. *See N L R B v. Tennessee Packers, Inc.*, 339 F.2d 203 (6th Cir. 1964). The more extreme an employer's wrongful provocation the greater would be the employee's justified sense of indignation and the more likely its excessive expression. To accept the argument addressed to us by the company would be to provide employers a method of immunizing themselves from the only real sanction against violations of [the statute]. Reinstatement in the instant case is not, as the employer puts it, a reward to the employee for insurgency. Rather, as we see it, refusal to reinstate her would put a premium on the employer's misconduct.

349 F.2d at 174.

The Eighth Circuit's discussion of the plaintiff's claim for back pay in *Excel* is particularly instructive here. The defendant argued that the plaintiff was not entitled to back pay because the evidence did not support a finding that sexual

30

harassment caused the plaintiff's termination; but rather, it had a legitimate reason for firing the plaintiff—that being, her pushing her sexual harasser in the chest and then pushing past a supervisor, which was reported as the plaintiff striking the supervisor.  165 F.3d at 638.  The court found proof "that impermissible discrimination was a 'motivating factor' in the employment decision, 'even though other factors also motivated' the employer's decision."  *Id*. at 638 (quoting *Pedigo v. P.A.M. Transp., Inc.*, 60 F.3d 1300, 1301 (8th Cir. 1995)).

The court reasoned:  "When an employee is fired because he acted to defend himself against harassment, which supervisors failed to take reasonable measures to prevent or correct, the termination process cannot be said to be free from discrimination."  *Id*. at 649  "This is so[,]" the court explained, "even if the ultimate decision maker was moved purely by a legitimate concern about personnel matters."  *Id*.  The plaintiff complained of unlawful harassment, the defendant chose not to act to stop it, the plaintiff engaged in conduct in response to the harassment, and she was terminated as a result.  *Id.*

In the present case, Mr. Bazzi claims that he was subjected to and complained about national origin harassment by co-workers for years, and that FCA's management failed to respond.  Notably, in 2019, Mr. Bazzi submitted a complaint stating that he had "been facing racial harassment and derogatory comments" since 2013, and specifically reported the comments of a co-worker that

31

"Trump [was] going to place [him] on the other side of the wall and give [his] job to a white man." (*See* ECF No. 13-15.)  Mr. Bazzi further stated that he was "getting tired of this" and "want[s] it to stop." (*Id*.)  A reasonable jury could find that Mr. Bazzi was acting to defend himself against, or at least was responding to, further national origin discrimination when he called his co-workers "white supremacists."  Mr. Bazzi explained the reasons for his outburst to FCA during its investigation of the incident.  Specifically, he provided that he was calling out for help to his manager, who was standing nearby and not responding while he was verbally attacked by co-workers.

Under these circumstances, the Court concludes that it is for the trier of fact to decide whether FCA used Policy 3-6 as a pretext for retaliation.

## V.  Conclusion

In summary, the Court finds that Mr. Bazzi has waived his national origin/ethnicity discrimination claim under § 1981.  The Court further finds that the only claims Mr. Bazzi is alleging in this lawsuit are timely-filed retaliation claims under Title VII and the ELCRA based on the September 15, 2020 incident and resulting discipline.  Lastly, the Court concludes that whether Mr. Bazzi proves these claims is for a jury to decide.

Accordingly,

**IT IS ORDERED** that FCA's motion for summary judgment (ECF No. 13) is **GRANTED IN PART AND DENIED IN PART** in that only Count I of Mr. Bazzi's Complaint is **DISMISSED WITH PREJUDICE**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: November 26, 2024